**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **SUSAN ANTILLA,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:09-cv-2128 (VLB)** |
| **L.J. ALTFEST & CO., INC.** | : | |
| **Defendant.** | : | **August 17, 2012** |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #41]**

## I. Introduction

**In 2007, the Plaintiff, Susan Antilla, hired the Defendant, Altfest & Co., Inc., to create and implement a financial investment plan on her behalf. Having suffered losses of approximately $1,200,000 in the market, the Plaintiff now claims that the Defendant engaged in six counts of unlawful conduct in the course of their business relationship, including breach of fiduciary duty (Count 1), breach of contract (Count 2), professional negligence (Count 3), negligent misrepresentation (Count 4), fraud (Count 5), and breach of the Connecticut Uniform Securities Act (Count 6).**

**Pursuant to Fed. R. Civ. P. 56(a), the Defendant, Altfest & Co., Inc., now moves for summary judgment on all counts of the Plaintiff's claim.**

## II. Factual Background

### A. The Retirement Plan

**The Plaintiff in this case is a professional financial journalist who has written articles for *USA Today, The New York Times*, and *Bloomberg*, and**

**regularly follows the financial markets and industry news. [Dkt. #41-2, Def.'s Rule 56 (a)(1) Stmt., ¶¶ 1,3].**

**The parties agree that on November 14, 2006, a month after receiving a lump sum divorce settlement of approximately $2.6 million, the Plaintiff contacted Defendant Altfest, a financial investment advising firm, with an interest in engaging its services. [*Id*. at ¶¶ 5, 6]. At that time, the Plaintiff was aware that her expenses exceeded her income, and understood that she would need to reduce her expenses to avoid depleting her assets during her lifetime. [*Id*. at ¶¶ 8,9]. Thus, on November 30, 2006, the Plaintiff hired the Defendant to prepare a long term retirement plan that would take care of her finances for the remainder of her life. [*Id*. at ¶ 10].**

**After a preliminary meeting with the Defendant, the Plaintiff filled out a Personal Financial Information Questionnaire. [*Id*. at ¶ 11]. In the questionnaire, the Plaintiff indicated that her "investment time horizon" was 5-10 years. [*Id*]. She also identified herself as a "risk-averse" investor, "wiling to forego growth...in order to avoid losses and preserve principal," and stressed her interest in being kept fully informed regarding her investments. [Pl. Ex. 1, ¶ 17 (citing to Def. Ex. Q)].**

**On May 23, 2007, the Defendant presented the Plaintiff with its Retirement Plan. [Dkt. #41-2 at ¶ 13]. Explicitly providing that "a correlation exists between risk and return," and "the chance to earn a higher return entails a higher risk," the Plan supplied the Plaintiff with four different scenarios, each offering a variation on the Plaintiff's asset allocation/expense reduction options. [*Id*. at ¶¶**

**14, 15]. Under the Plan, the Plaintiff could choose to (1) make no changes to her current asset allocation; (2) leave her investable assets predominantly in cash and bonds, while decreasing her annual expenses by $40,000; (3) adjust her asset allocation by increasing equities from 3% to 25%, while decreasing her annual expenses by $25,000; or (4) adjust her asset allocation by increasing equities from 3% to 50%, while decreasing her expenses by only $7,500 annually. [*Id*. at ¶ 14].**

**At their meeting, the Defendant informed the Plaintiff that she should not select a 50:50 asset allocation if she would "decide to get out" when the market was down. [*Id*. at ¶ 12]. At the same time, however, the Defendant also expressed to the Plaintiff that the fourth scenario had the highest probability of meeting the Plaintiff's goals, at 93%. [Dkt. #47-1, Pl.'s Rule 56 (a) (1) Stmt.,¶ 7]. The Plaintiff now alleges that, according to an expert in the field, the Defendant's simulations for arriving at the 93% number were erroneous, and that, contrary to the Defendant's representation, the fourth option was, in fact, the *least* likely to accomplish the Plaintiff's goals, at only 76.7%. [*Id.*].**

**Nevertheless, at the time, the Plaintiff trusted the Defendant's representations. [*Id*]. On June 1, 2007, after considering her options for eight days, the Plaintiff informed the Defendant by email that she had "decided to go with 50% equity," and requested that the Defendant use that figure to create an investment portfolio for her review. [Dkt. #41-2 at ¶¶ 17, 19]. The Plaintiff asserts in her affidavit that she chose Scenario Four of the Retirement Plan "in reliance upon representations presented to me by Altfest in recommending this allocation**

**to me as the best option." [Pl. Ex. 1, ¶ 9]. More specifically, the Plaintiff claims that she relied on: "(1) [Defendant] stating to me that I should allocate at least 50% of my liquid assets to equities; (2) [Defendant] warning me of the serious risks that my assets would be eroded by inflation if I failed to substantially increase my allocation to equities; (3) the statement in the Plan that the 50% allocation to equities in scenario four had the highest probability of lasting the rest of my life at 93%; and (4) that I had communicated to Altfest that I was very conservative, risk-averse, and that I had a low threshold for losses, and yet they still recommended that I allocate 50% to equities." [*Id*.].**

**B. The Investment Performance Worksheet**

**As per the Plaintiff's request, the Defendant then prepared an Investment Review on her behalf, detailing a long term investment plan based on a portfolio strategy allocating 50% to equities. [Dkt. #41-2 at ¶¶ 19, 20]. On July 11, 2007, the Defendant presented the Review to the Plaintiff. [*Id*. at ¶ 20]. At that time, the Plaintiff was free to implement whatever portions of the Review that she desired on her own, or even to use another broker in doing so. [*Id*. at ¶ 21]. She was not required to implement any of the Review's investment recommendations, nor was she obligated to use the Defendant as her financial advisor. [*Id*. at ¶ 21].**

**According to the Plaintiff's affidavit, the day after the July 11 meeting, the Plaintiff requested documentation from the Defendant regarding its past performance numbers for the last ten years. [Pl. Ex. 1, ¶ 12]. She wished to examine the numbers "before making a decision as to whether to use [Defendant's] services." [*Id.*]. On July 25, 2007, the Defendant provided the**

**Plaintiff with its Investment Performance Worksheet. [*Id.*]. The sheet laid out the Defendant's performance numbers from the prior 25 years, and indicated that, even during a market decline of over 20% from 2001-2002, the Defendant's market strategies had been successful in limiting losses for its clients. [*Id.*].**

**On August 13, 2007, the Plaintiff chose to hire the Defendant to implement its investment plan and manage her account with "full discretionary authority." [Dkt. #41-2 at ¶ 23]. According to the Plaintiff, she did so only with the understanding "(1) that a 50% allocation of her assets was suitable for her conservative investment profile and risk tolerance; (2) that Altfest had a 25-year history of out-performing the markets and avoiding significant losses during volatile and steeply declining markets and that it had provided to her proper documentary support for those claims; and (3) that Altfest's Retirement Plan provided accurate projections of her future financial needs." [Dkt. #47-1 at ¶ 1].**

**In their contract, the parties provided that the account over which the Defendant was to exercise discretion would consist of "all securities, cash and cash equivalents and other assets in [Plaintiff's] accounts except those assets, which, by mutual agreement, shall be specifically excluded." [Dkt. #41-2 at ¶ 25]. The parties further specified that the Defendant would have the authority of "making and implementing investment decisions, all without prior consultation, subject only to such limitation as [Plaintiff] may specify in writing." [*Id*. at ¶ 24]. At no time did the Defendant communicate to the Plaintiff that she would not suffer losses in down markets. [*Id.* at ¶ 30]. Additionally, both the Plaintiff and the**

**Defendant reserved the right to terminate the contract at any time by providing the other party with written notice. [*Id*. at ¶ 25].**

**C. The Investments**

**In early September of 2007, the Defendant began to make investments on behalf of the Plaintiff. [*Id*. at ¶ 26]. In the following months, the Plaintiff closely monitored her investments, and regularly communicated with the Defendant in regard to the account. [*Id*. at ¶¶ 27, 28].**

**The next year, in 2008, the Securities and Exchange Commission ("SEC") completed an examination of the Defendant's books and records. [Pl. Ex. 7]. Pursuant to its audit, on February 4, 2008, the SEC informed the Plaintiff of deficiencies in its Investment Performance Worksheet. [*Id.* at pp. 2-5]. For example, because the Defendant had not maintained documentation for the performance calculations contained in the worksheet for the period prior to 1993, the SEC requested that the Defendant take action to correct the unsupported and potentially misleading numbers. [*Id.* at p. 9]. Moreover, the Plaintiff now claims that the Defendant's representation that it had out-performed the markets by an average of 2.7% over its 25-year history were false, and in fact, "violate well-established mathematical studies" known to the Defendant. [Dkt. # 47, Pl.'s Opposition to Summary Judgment, p. 8].**

**In accordance with the SEC's requests, the Defendant subsequently amended the past-performance data worksheet. [Dkt. #47-1, ¶ 5]. However, according to the Plaintiff, the Defendant failed to inform her of the alterations, nor did the Defendant disclose to her that the data she had relied on had been**

**potentially deceptive. [*Id.*]. The Plaintiff now claims that the Defendant has a history of such misleading practices, as it had been cited for the same conduct ten years earlier, in 1997. [*Id.* at ¶ 6].**

**D. The Financial Losses**

**In early 2008, the Plaintiff "became concerned about the cash reserves in [her] account." [Pl. Ex. 1 at ¶ 16]. Consequently, the Plaintiff chose to liquidate a portion of her equities portfolio despite her earlier representations to the Defendant that she sought a long term plan. [Dkt. #47-1 at ¶ 11; Def. Ex. A, p. 202].**

**While the parties agree that by December of 2008, the Plaintiff had reduced her equities to only 13%, they are in dispute regarding the portfolio reduction. [Def. Ex. A, p. 202; Dkt. #47-1 at ¶ 29]. Relying on the Plaintiff's Deposition, the Defendant claims that, by June 3, 2008, the Plaintiff had completely revoked the Defendant's discretionary authority over her account. [Dkt. #41-2, at ¶ 29; Def. Ex. A, p. 171-173.] Conversely, the Plaintiff, relying on her affidavit, asserts that "it is not true that I terminated all of [Defendant's] discretionary authority for my accounts as of June 3, 2008," as evidenced by the fact that the Defendant "continued to utilize discretion in my accounts and execute trades without obtaining my prior authorization." [Pl. Ex. 1, ¶ 17]. The Plaintiff claims that the Defendant is taking her deposition out of context by reading it to suggest otherwise. [Dkt. # 47, p. 6].**

**Additionally, the Defendant further alleges that, in November of 2008, the Plaintiff sold the remainder of her equity positions without determining the losses she would suffer. [Dkt. #41-2, at ¶ 32]. The Plaintiff counters the Defendant's**

**claim by pointing to her affidavit, which indicates that she merely sought to *reduce*, and not eliminate, her equities at that time. [Pl. Ex. 1, ¶ 18]. In support of her claim, the Plaintiff maintains that she "still had over $300,000 in equities ...at the time [she] terminated [her] relationship with [Defendant] in June 2009." [*Id.*]. In any case, the parties agree that, in electing to decrease her equity positions, the Plaintiff acted against the Defendant's advice that she abide by her long term investment strategy rather than sell. [Dkt. #41-2, ¶ 33].**

**The Plaintiff now asserts that she suffered $1,194,615 in investment losses during the course of her business relationship with the Defendant. [Dkt. #47-1, ¶ 4]. She claims that but for following the Defendant's investment recommendations and engaging its services, she would have avoided the losses she suffered. [*Id.*].**

## III. Standard of Review

**"The standards governing summary judgment are well settled." *Ford v. Reynolds*, 316 F.3d 351, 354, 379 (2d Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of[its] case with respect to which [it] has the burden of proof." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).**

**"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford,* 316 F.3d 101, 105 (2d Cir. 2002).**

**"[T]he burden on the moving party may be discharged by 'showing'- that is pointing out to the district court- that there is an absence of evidence to support the nonmoving party's case."** ***PepsiCo. Inc. v. Coca-Cola Co.,*** **315 F. 3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue of material fact, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."** ***Burt Rigid Box, Inc. v. Travelers prop. Cas. Corp.,*** **302 F.3d 83, 91 (2d Cir. 2002).**

**The Court must "construe the evidence in the light most favorable to the nonmoving party and…draw all favorable inferences in its favor."** ***Huminski v. Corsones*****, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied.** ***Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*****, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted).**

## IV. Discussion

### A. Breach of Fiduciary Duty Claim

**A claim for breach of fiduciary duty initially rests on the Plaintiff's ability to establish a fiduciary relationship between herself and the Defendant.** ***Murphy v. Wakelee*****, 247 Conn. 396, 400 (1998). Such a relationship "implicates a duty of loyalty and honesty,"** ***Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*****, 247 Conn. 48, 56 (1998), and "is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill**

**or expertise and is under a duty to represent the interests of the other."** ***Cadle Co. v. D'Addario*****, 268 Conn. 441, 455 (2004) (citing** ***Konover Development Corp. v. Zeller*****, 228 Conn. 206, 219 (1994)). Once the Plaintiff establishes a fiduciary relationship, the burden of proof shifts to the fiduciary to establish fair dealing with clear and convincing evidence.** ***See Cadle Co.*****, 268 Conn. at 455-6. Under this burden-shifting scheme, "[a] fiduciary seeking to profit by a transaction with the one who confided in him has the burden of showing that he has not taken advantage of his influence or knowledge and that the arrangement is fair and conscientious."** ***Id.*** **at 457.**

**Here, the Defendant owed the Plaintiff a duty of loyalty because it acted as an investment advisor to the Plaintiff.** ***See Madison v. Rightway Partners*****,** ***LLC*****, 2012 WL 90156, *4 (D. Conn. Jan. 11, 2012) ("'[A]dvisors who hold themselves out as knowledgeable about financial matters, and who encourage individuals to rely on their purported expertise create a relationship warranting imposition of a fiduciary duty.").**

**The Defendant does not dispute the fact that it owed a fiduciary duty to the Plaintiff. [Dkt. #41-1, p.10]. Rather, the Defendant contends that it did not breach this duty. [Dkt. #51-1, p.7]. The Defendant rests its argument on the grounds that, while Connecticut Courts "have not** ***expressly*** **limited the application of ... fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations."** ***Murphy,*** **247 Conn. at 400. The Defendant asserts that because "professional negligence alone...does not give rise automatically to a claim for breach of**

**fiduciary duty," the Defendant could not have breached its duty in this case as a matter of law. *Beverly Hills*, 247 Conn. at 56. In so arguing, however, the Defendant fails to address the substance of the Plaintiff's allegations.**

**a. The Investment Performance Worksheet**

**To begin, the Plaintiff claims that she requested documentation of the Defendant's performance record before hiring the Defendant to implement its Investment Plan on her behalf. Accordingly, the Defendant presented the Plaintiff with its Investment Performance Worksheet. The Worksheet purported to show that, for the past 25 years, the Defendant's clients had outperformed the market by an average of 2.7%, and had maintained their advantage even throughout historic market slumps. [Dkt. #47, p.8]. The Plaintiff now claims that the figures in the Worksheet were unsupported, erroneous, and mathematically unsound. [*Id*.]. Thus, the Plaintiff asserts that the Defendant breached its duty of honesty by providing her with information that the Defendant knew to be false.**

**In support of her claim, the Plaintiff points toward the results of the SEC's 2007-8 audit of the Defendant. In 2008, the SEC informed the Defendant that its performance history worksheet, the same worksheet the Defendant gave to the Plaintiff, contained potentially misleading information because the Defendant failed to provide the SEC with appropriate documentation and support for the figures relating to years prior to 1993. [Dkt. # 47-1, p. 5]. Moreover, the Plaintiff now claims that the Defendant had been previously cited for the same conduct in connection with an audit by the SEC that took place in 1997. [*Id*.]. The Plaintiff therefore argues that the Defendant breached its fiduciary duty because it**

**knowingly supplied her with false information, which was later found by the SEC to be both misleading and unsubstantiated. [*Id*.].**

**Additionally, the Plaintiff also rests her claim on testimony by former SEC senior financial economist, Craig McCann, PhD. Instead of focusing solely on the Defendant's pre-1993 numbers as did the SEC's report, McCann's testimony calls into question the Worksheet in its entirety. [Dkt. # 47, p. 9]. According to McCann, "[Defendant's] clients *could not* have each year had the returns in the aggregate that [Defendant] claims for representative client portfolios from 1982 to 2006." [Pl. Ex. 17, p. 209] (emphasis added). McCann asserts that the Defendant's Worksheet's figures were not only lacking in appropriate documentary support, but what is more, "from a qualitative standpoint, the probability that [Defendant's] unsupported and/or unverified claims are true is 'infinitesimal,' based upon well-established mathematical models known as 'Modern Portfolio Theory.'" [Dkt. # 47, p. 4]. On the foregoing grounds, the Plaintiff argues that the Defendant, who has acknowledged the tenants of Modern Portfolio Theory in a book published by its founder, knowingly supplied her with false information in breach of its duty of honesty and loyalty to her. [*Id.* at p. 9].**

**Knowingly supplying a client to whom a fiduciary duty exists with false information has been recognized as a breach of fiduciary duty. *See Spector v. Konover*, 57 Conn. App. 121, 129, 747 A.2d 39, 44 (2000) (holding that the defendants breached their fiduciary duty to the plaintiff by supplying the plaintiff with a financial report containing misleading information, for example, inflating the true amount of money contained in a particular bank account).**

**In rebuttal, the Defendant first argues that it did not breach its fiduciary duty as a matter of law. In regard to the expert's testimony that the Defendant's figures were insufficiently supported, the Defendant argues that the testimony is inadmissible because the expert simply offers his "personal opinion" on the matter without raising a genuine dispute of fact. [Dkt. # 51-1, 5]. The Defendant fails, however, to challenge McCann's assertions in regard to the accuracy of the figures on the Worksheet in light of modern investment theory. [*Id.* at p. 22 n.8]. Indeed, ignoring McCann's testimony regarding Defendant's alleged falsification of its performance numbers, the Defendant claims that the Plaintiff "has not presented any evidence to suggest that [Defendant] was engaged in fraud, self-dealing, or immoral behavior." [Dkt. # 41-1, p. 15].**

**Furthermore, the Defendant also questions the Plaintiff's reliance. First, the Defendant points out that the SEC's criticisms focused on the Defendant's performance numbers for 1982-1993, while the Plaintiff testified in her deposition to have relied on the Defendant's impressive numbers for 2002 in choosing to give the Defendant discretion over her account. [Dkt. # 51-1, 7]. The Defendant claims that this, in addition to the fact that the Plaintiff requested only the last ten years of the Defendant's history, indicates that the Plaintiff could not have relied on the 14 to 25-year-old performance statistics in making her decision. [*Id*. at 3]. Nevertheless, even as the Defendant disputes the Plaintiff's claim that she relied on the pre-1993 numbers, it fails to address the Plaintiff's allegations regarding the accuracy of the later figures on the Worksheet. [*Id.* at 4].**

**In sum, the Plaintiff relies on expert testimony and an SEC audit to allege that the Defendant supplied her with false and misleading numbers in its Worksheet. In contrast, the Defendant challenges the accuracy of the testimony of the Plaintiff's expert witness, and asserts that, in any event, the Plaintiff did not rely on the figures later brought into doubt by the SEC. Where the Defendant has failed to refute the Plaintiff's expert testimony and has merely attacked the weight of such testimony, summary judgment is not warranted, as a material factual dispute exists regarding whether the Defendant violated its duty of honesty to the Plaintiff. *See Am. Home Assurance*, 446 F.3d at 315 ("[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."). Additionally, the Defendant is not entitled to judgment as a matter of law because the Defendant has failed to sustain its burden of establishing by clear and convincing evidence that the arrangement between the Plaintiff and the Defendant was fair. *See Cadle Co.*, 268 Conn. At 455-6 (holding that once the Plaintiff establishes a fiduciary relationship, the burden shifts to the fiduciary to establish fair dealing with clear and convincing evidence).**

**b. The SEC Audit**

**In 2008, the Defendant amended its Worksheet in compliance with the SEC's audit. Thereafter, the Defendant failed to inform the Plaintiff that it had amended the Worksheet, and that she had been provided with potentially misleading information when she had entered into her Investment relationship with the Defendant. [Dkt. # 47-1, p. 5]. Consequently, the Plaintiff now argues that**

**the Defendant's failure to inform her of the SEC's findings was an omission amounting to a breach of the Defendant's fiduciary duty.**

**Failing to provide a "free and frank disclosure of all the relevant information" to one to whom a fiduciary duty is owed has been recognized as a breach of the duty of honesty. *See Spector*, 57 Conn. App. at 129 (holding that the defendants breached their fiduciary duty "by not making a free and frank disclosure of all the relevant information" by appropriating interest earnings from an account without notifying the plaintiffs of this appropriation); *see also Pacelli Bros. Transp., Inc. v. Pacelli*, 189 Conn. 401, 409 (Conn. 1983) (finding a breach of fiduciary duty where corporate officer failed to disclose misappropriation of funds to principals because such behavior constituted a failure "to disclose information relevant to a transaction" with those to whom he owed a duty of honesty).**

**In response, the Defendant disputes the material fact as to whether the Defendant's omission constitutes a breach of fiduciary duty. First, the Defendant argues that it had no duty to notify its clients that a routine SEC audit was taking place. [Dkt. #51-5, p.6]. Moreover, the Defendant claims that the Plaintiff's argument must fail because she "has not introduced any evidence that the 2007-8 audit resulted in an investigation, any form of reprimand, or any requirement of disclosure to clients." [*Id*. at p.2]. Finally, the Defendant argues that, in any case, the SEC staff "did NOT find that any performance number was incorrect," but rather, that the SEC staff simply considered the Defendant's pre-1993 numbers to be insufficiently supported by documentation. [*Id*. at p.3].**

**Therefore, the Defendant and the Plaintiff dispute a material fact, specifically, whether the Defendant breached its fiduciary duty by failing to disclose information that was materially relevant to its relationship with the Plaintiff, i.e. that it had issued an amended performance history worksheet after the SEC concluded that the original worksheet was false and misleading.**

**Thus, several material factual disputes exist in regard to the Plaintiff's claim of fiduciary duty, including: (1) whether the Defendant supplied the Plaintiff with deceptive information in breach of its duty of honesty and loyalty, and (2) whether the Defendant's omitted material information by failing to inform the Plaintiff that it had amended its Investment Performance Worksheet in accordance with the SEC's audit.**

**Where material factual disputes exist regarding the Defendant's supply of information to the Plaintiff and failure to supply information to the Plaintiff, summary judgment must be denied as to Plaintiff's claim of a breach of fiduciary duty (Count One).**

**B. Breach of Contract Claim**

**Plaintiff has also raised a claim for breach of contract in her action against the Defendant. To prevail on a breach of contract claim, a plaintiff must provide adequate evidence to support four necessary elements, including "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."** ***Rosato v. Mascardo*****, 82 Conn. App. 396, 411 (2004) (quoting** ***Bouchard v. Sundberg,*** **80 Conn. App. 180, 189 (2003)).**

**According to the facts as asserted by the Plaintiff, in November of 2006, the Plaintiff contracted with the Defendant to supply her with a retirement plan.[1] The Defendant subsequently presented the Plaintiff with its Retirement Plan, which consisted of four investment scenarios, ranging in profitability and risk. Aware that the Plaintiff was a conservative investor, the Defendant nevertheless advised the Plaintiff to choose Scenario Four, the investment plan entailing the highest risk. Under that option, the Plaintiff would allocate 50% of her investments to equities. The Defendant represented to the Plaintiff that such a plan would result in a 93% probability—the highest of the four scenarios offered—of meeting her investment goals. The Plaintiff alleges that, relying on the Defendant's representations, as well as its recommendation, the Plaintiff opted to invest her assets in accordance with Scenario Four.**

**The Plaintiff now claims that the Defendant utilized faulty methodology in arriving at the 93% probability of success figure upon which she relied. [Dkt. # 47-1, p. 6]. In support of her assertion, the Plaintiff offers testimony from her expert witness indicating that Scenario Four should have been listed as having only a 76.7% probability of success— a lower probability than any of the three alternative plans. [Pl. Ex. 17, pp. 66-70]. Consequently, the Plaintiff contends that "these fundamental errors in the Retirement Plan calculations constitute a breach of contract of the defendant's duties in rendering this service. [*Id.*].**

---

**[1] The Plaintiff claims that she "initially and separately had a contract with the Defendant" regarding the Retirement Plan. [Dkt. # 47-1, p. 5]. Her breach of contract claim stems from this initial contract, and not the subsequent contract of August 13, 2007, in which the Plaintiff gave the Defendant discretion over her account.**

**The Defendant argues that the Plaintiff has not adequately alleged a breach of contract because her claim sounds in professional malpractice, and not in contract. [Dkt. #41-1, p. 20]. Under Connecticut law, breach of contract claims will not stand if they "sound in malpractice" rather than a party's failure to perform a contractual duty. *Rosato,* 82 Conn. App. at 411-12. Although "it is possible for a negligence claim and a contract claim to arise out of the same facts," the two claims are distinct, and require differing grounds for relief. *Id.* at 411-12. While professional malpractice "'is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied…by the average prudent reputable member of the profession,'" a breach of contract claim rests on the breach of an agreement. *Id.***

**Here, the Plaintiff does not claim that the Defendant failed to provide her with the investment options she sought in breach of its contractual duty. Nor does the Plaintiff claim that the Defendant contracted to provide her with any specific result, which the Retirement Plan then failed to accomplish. Rather, she alleges that in providing her with the contracted-for Plan, the Defendant failed to act with ordinary care in calculating the probable success rates of the scenarios therein. Thus, even when the evidence is viewed in a light most favorable to the Plaintiff, her breach of contract claim must fail as a matter of law. *See Barnes v. Schlein*, 192 Conn. 732, 735-36 (1984) (refusing to consider a breach of contract claim where "the gravamen of the suit was the alleged failure by the defendant to exercise the requisite standard of care," and the plaintiff failed to allege "that the defendant breached any contractual agreement made with her").**

**In sum, the Plaintiff alleges that the Defendant supplied her with erroneous figures when it presented its Retirement Plan to her in accordance with their contractual agreement. Such a claim sounds in professional negligence, and not in breach of contract. Accordingly, the Defendant's motion for summary judgment is granted as to Plaintiff's Breach of Contract claim (Count Two).**

**C. Professional Negligence Claim**

**Plaintiff's third claim alleges that the Defendant's conduct amounted to professional negligence on multiple occasions in the course of its dealings with her.**

**"Professional negligence or malpractice . . . [is] defined as the *failure of one rendering professional services* to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." *Gold v. Greenwich Hosp. Ass'n,* 262 Conn. 248, 254 (2002) (quoting *Trimel v. Lawrence & Memorial Hospital Rehabilitation Center*, 51 Conn. App. 353, 357-58, 764 A.2d 203, *appeal dismissed*, 258 Conn. 711, (2001)). In order to establish a claim of professional negligence, "it is essential to establish both the standard of skill and care applicable, and that the defendant failed to conform to the standard, as these matters are outside the knowledge of the jury." *Matyas v. Minck*, 37 Conn. App. 321, 326-27, 655 A.2d 1155, 1158 (1995). In cases of professional negligence involving "technical expertise beyond the ordinary knowledge and experience of jurors and judges," expert testimony is required in order to prove professional negligence. *Id.* at 327.**

**First, the Plaintiff claims that the Defendant committed professional negligence because "the defendant's representations to the plaintiff that a 50% allocation of her assets to equities was suitable for her conservative investor's profile and risk tolerance was false," and, as such, constituted a breach of the professional standard of care. [Dkt. # 47-1, p. 4]. Additionally, the Plaintiff claims that "the Defendant's representations regarding its past-performance results…were false and a breach of the professional standard of care." [*Id*.]. In support of her claims, the Plaintiff offers testimony by financial expert Dr. McCann. In his testimony, McCann states that "as an advisor, financial professional has a duty to have a reasonable basis for the recommendations they make. An advisor, a financial professional also have the duty to make a full and complete disclosure of the material facts about an investment." [Dkt. #47, Ex. 17, McCann Dep., 164:13-21]. McCann opines that the Defendant violated the applicable standard of care in (1) failing to have a reasonable basis for the 50 % equity allocation recommendation they were making, (2) failing to provide the Plaintiff with full disclosure of material facts in making the recommendation, and (3) materially misrepresenting its performance numbers to the Plaintiff in its Investment Performance Worksheet. [*Id.* at p. 167, 201].**

**a. The Retirement Plan**

**In regard to the Defendant's obligation "to have a reasonable basis for [its] recommendations" to clients, McCann testifies that "given [Defendant's] assessment of [Plaintiff] as being risk terrified and her statement that the most she was willing to lose in any one year was five percent," the Defendant's**

**conduct in recommending that the Plaintiff allocate 50% of her funds to equities amounts to a breach of the professional standard of care. [*Id*.]. McCann opines that, according to the typical understanding of investment professionals, "the 50% portfolio was substantially more risky than portfolios typically thought of as appropriate for investors with the Plaintiff's stated preferences." [*Id*. at p. 170]. Moreover, McCann explains that "any major broker/dealer and many large investment advisors in their websites would have model portfolios, different asset allocations for investors with different risk tolerances." [*Id*.]. According to McCann, he "can't imagine [Plaintiff] fitting in anything but the most conservative of those model[s]," which "would have five or ten percent in stock and the rest…in cash and bonds." [*Id*.]. On these grounds, the Plaintiff alleges that the Defendant's recommendation of a 50% equities plan constituted a breach of the professional standard of care.**

**Furthermore, according to McCann, financial advisors "also have the duty to make a full and complete disclosure of material facts about the investment." [Dkt. #47, Ex. 17, p. 164]. McCann claims that "because she said that the most she was willing to lose, could afford to lose, was five percent," the Defendant should have known that the Plaintiff "was extraordinarily risk adverse." [*Id*. at p. 165]. Nevertheless, according to McCann, the Defendant did not fully and appropriately disclose to the Plaintiff "the additional risk that was being taken in order to get those higher returns." [*Id*.].**

**b. The Investment Performance Worksheet**

**Finally, the Plaintiff also claims that the Defendant breached the standard of care in providing her with an inaccurate Investment Performance Worksheet. In his deposition, McCann critiques the Defendant's methodology in arriving at Investment Performance numbers that he finds to be mathematically unsound in violation of the standard of care. [Dkt. #47, Ex. 17, p. 167, 208-09]. According to McCann, the Defendant presented the Plaintiff with numbers that were "not plausible" and "not in fact representative." [*Id*. at p. 134-35].**

**In response to the Plaintiff's claims of professional negligence the Defendant argues that the Plaintiff has failed to present sufficient evidence to raise any genuine issue of material fact to be tried before a finder of fact, contending that Plaintiff's "conclusory affadavits, even from expert witnesses, do not provide a basis on which to deny motions for summary judgment."** ***Morales v. Kagel*, 58 Conn. App. 776, 781 (2000). According to the Defendant, "the only 'evidence' that the plaintiff offers in support of her negligence claim is the conclusory opinion of her expert witness." [Dkt. #51-1, p. 9].**

**In so arguing, however, the Defendant fails to acknowledge the substance of the testimony of the Plaintiff's expert witness. McCann does not merely allege the conclusion that the Defendant breached its duty of care to the Plaintiff. Rather, as discussed above, the Plaintiff's expert identifies applicable professional standards of care and provides particularized fact-based testimony to conclude that the Defendant failed to act in accordance with such standards of care in recommending a high-risk investment plan to a risk-averse investor,**

**failing to disclose material information regarding its investment strategy, and supplying her with an inaccurate Performance Worksheet.**

**Essentially, the Defendant seeks to weigh its evidence against the Plaintiff's to assert that it did not breach its duty to the Plaintiff as a matter of law. First, the Defendant attempts to discredit the Plaintiff's witness by arguing that the Plaintiff's expert "has remained unaware of the Plaintiff's shifting risk tolerance and has focused only on the picture drawn in the Questionnaire because his rushed review of the case did not include a review of all the deposition transcripts or any of the multiple communications among [Plaintiff] and [Defendant's] personnel." [*Id.* at p. 22 n. 8). Additionally, the Defendant argues that "as reflected in the meeting notes and correspondence…[the Plaintiff's] risk tolerance evolved as she recognized the need to add stocks to her portfolio for diversification, for tax reasons, and as protection against inflation," and thus, "the Plaintiff cannot, as a matter of law, recover losses that she locked in by making bad choices." [Dkt. #41-1, p. 21-22]. This attempt request of the Court to weigh the evidence is not appropriate at this stage of the proceedings. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) ("On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried."). Consequently, where the Defendant seeks only to discredit the Plaintiff's expert, the Defendant has failed to establish an absence of material factual disputes regarding Plaintiff's professional negligence claim. Rather, disputes of material fact exist as to whether the Defendant's**

**investment recommendations to the Plaintiff complied with the applicable professional standards of care. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim of professional negligence (Count Three) is denied.**

**D. Negligent Misrepresentation Claim**

**In count four, the Plaintiff claims that the Defendant made multiple "materially false and deceptive" representations to her in the course of their business relationship. [Pl.'s Complaint, Dkt. # 9, ¶ 25].**

**Liability for negligent misrepresentation is premised on a plaintiff's ability to prove "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."** ***Nazami v. Patrons Mut. Ins. Co.,*** **280 Conn. 619, 626 (2006). "Whether evidence supports a claim of ... negligent misrepresentation is a question of fact" to be determined by a trier of fact in cases of material dispute.** ***Giametti v. Inspections, Inc.*****, 76 Conn. App. 352, 364 (2003) (quoting** ***Mips v. Becon, Inc.,*** **70 Conn. App. 556, 558 (2002)).**

**In this case, the Plaintiff identifies two purported negligent misrepresentations. Specifically, the Plaintiff alleges that the Defendant negligently made material misrepresentations upon which the plaintiff relied to her detriment when it (1) advised her that allocating fifty percent of her assets to equities was the Retirement Plan strategy most likely to meet her investment goals and (2) supplied her with misleading evidence of "the superior past returns**

**achieved in its clients' accounts" in its Investment Performance Worksheet. [Pl.'s Complaint, Dkt. # 9, ¶ 25].**

**a. The Retirement Plan**

**In support of her claims, the Plaintiff presents testimony from financial expert, Craig McCann. As discussed regarding count one, McCann claims that in recommending a 50% equities plan to the Plaintiff, the Defendant presented her with false information. [Dkt. #47, Ex. 17, pp. 66-70]. More precisely, McCann claims that the Defendant falsely identified scenario four as 93% likely to achieve the Plaintiff's investment goals. [*Id*.]. According to McCann, had the Defendant correctly performed its simulations, the probability of success for Scenario Four would have been the lowest, and not the highest, of the four options in the Retirement Plan, at only 76.7%. [*Id*.]. On these grounds, the Plaintiff now claims that the Defendant engaged in negligent misrepresentation when it provided her with erroneous probability of success results.**

**b. The Investment Performance Worksheet**

**Furthermore, as detailed in counts one and three, McCann claims that the Defendant's representations in its Investment Performance Worksheet were both unsubstantiated and fundamentally flawed. [*Id*. at pp. 132-5, 167-8, 207-210]. McCann alleges that the Worksheet's representation that the Defendant's clients had continuously and significantly outperformed the markets over the past twenty five-year period was mathematically impossible. [*Id*.]. The Plaintiff now alleges that she relied upon the Defendant's misrepresentation to her detriment. [Dkt. # 9, p. 7].**

**The Defendant contends that Plaintiff cannot sustain her claim of negligent misrepresentation because she has failed to establish that the Defendant made a false statement of *fact*. Defendant's argument misrepresents the applicable caselaw. Defendant relies on *Presley v. Pepperidge Farm, Inc.*, 356 F.Supp.2d 109 (D.Conn. 2005) to argue that negligent misrepresentation requires a false factual statement. However, although in certain instances the Court in *Presley* uses the term "fact," the Defendant has taken this term out of context, ignoring the Court's explication of the applicable standard of law. The Court in *Presley* expressly recognizes that "[t]he governing principles of negligent misrepresentation are set forth in § 552 of the Restatement Second of Torts (1979), which states: 'One who, in the course of business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information.*'" *Presley*, 356 F.Supp.2d at 135 (citation omitted).**

**This standard describes precisely the conduct which Plaintiff's expert opines was utilized by the Defendant regarding the Plaintiff's investment portfolio. Accordingly, Defendant's argument, having misconstrued the standards of negligent misrepresentation, cannot establish that the Defendant is entitled to judgment as a matter of law.**

**Defendant also asserts that Plaintiff cannot establish the element of proximate causation to demonstrate the final necessary component of a negligent misrepresentation claim, requiring proof that the alleged misstatement caused**

**the damages in question. Defendant argues that "although the Plaintiff is looking to blame someone for her losses, she cannot attribute the steps she took to realize losses to any factual misrepresentation attributable to [Defendant]." [Dkt. # 41-1, p. 33]. Defendant contends that Plaintiff rescinded her prior grant of discretionary authority over her finances and subsequently began to manage her own account, converting a long-term investment plan into a short-term plan. As such, Defendant claims that Plaintiff cannot establish that Defendant's investment strategy was the proximate cause of her losses, where her intervening conduct deviated from the plan.**

**In so arguing, the Defendant disregards the fact that "the question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue.... if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact."** ***Kumah v. Brown*****, 130 Conn. App. 343, 349 (2011) (quoting** ***Alexander v. Vernon,*** **101 Conn. App. 477, 485 (2007)). The question of whether or not Plaintiff's increasingly direct role in the management of her investment portfolio constitute a break in the chain of proximate cause is a close factual question to be resolved by the jury as the trier of fact.**

**Thus, Defendant has failed to establish that it is entitled to judgment as a matter of law with regards to Plaintiff's claim of negligent misrepresentation, having misstated the standard for a misrepresentation. Moreover, the Plaintiff has set forth sufficient facts for a reasonably jury to conclude that she suffered losses as a result of her reliance on misrepresentations made by the Defendant**

having provided expert testimony to demonstrate that (1) the Defendant falsely and negligently represented to the Plaintiff that a 50% equities allocation was suitable for the Plaintiff despite her risk-averse profile, and (2) the Defendant falsely and negligently presented the Plaintiff with past-performance results that were similarly misrepresentative. Accordingly, the Defendant's motion for summary judgment as to Plaintiff's claim of negligent misrepresentation (Count Four) is denied.

E. Fraud Claim

In count five, the Plaintiff alleges that the Defendant committed acts of fraud by (1) knowingly or recklessly providing her with false information and (2) failing to supply her with material facts relevant to its fiduciary relationship with her.

A fraudulent representation "is one that is knowingly untrue, or made without belief in its truth, or recklessly made…for the purpose of inducing action upon it." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142 (2010) (quoting *Kramer v. Petisi,* 285 Conn. 674, 684 n. 9 (2008)). "Fraud consists [of] deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Reid v. Landsberger*, 123 Conn.App. 260, 281, 1 A.3d 1149, 1163 (2010) (quoting *McCann Real Equities Series XXII, LLC v. David MCDermott*

***Chevrolet, Inc.*, 93 Conn.App. 486, 518, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006)). A plaintiff seeking to establish a claim of fraud "must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory, or clear, precise and unequivocal." *Id.* "The determination of what acts constitute fraud is a question of fact." *Id.***

**a. The Investment Performance Worksheet**

**First, the Plaintiff alleges that the Defendant engaged in knowing or reckless misrepresentation by providing her with false numbers in its Investment Performance Worksheet. In particular, Plaintiff claims that the Defendant falsely reported that it had out-performed the markets by an average of 2.7% over its 25-year history. [Dkt. # 47, p. 8]. As discussed above, Plaintiff substantiates this assertion with testimony from an expert witness opining that the figures were mathematically impossible under Modern Portfolio Theory. [Dkt. #47, Ex. 17, p. 209]. In order to establish that the Defendant was not merely negligent, but rather, was aware of, or reckless in regard to, the false numbers, the Plaintiff notes that the Defendant had "acknowledge[d] the basic tenets of Modern Portfolio Theory in his 1992 book," which reads in part: "[M]odern investment theorists believe that you cannot have better-than-average results in the stock market."**

**Further, the Plaintiff contends that the Defendant must have been aware of the inaccuracy of the statistics in its Performance Workship in light of the SEC's SEC's conclusion that the figures were unsubstantiated and misleading. Specifically, Plaintiff argues that, "the Defendant's violation of the SEC's rules**

**against false, deceptive and misleading marketing investigated by the SEC in 2008 involved the same practices that the SEC had cited the Defendant for in 1997," demonstrating "that the Defendant's false, deceptive, and misleading representations at issue were undertaken deliberately or with a reckless disregard as to whether they were true or not and thus were fraudulent." [Dkt. #47, p. 9]. Plaintiff points to a June 3, 2008, letter from the SEC to the Defendant, which reads in relevant part: "[I]n 1997, [Defendant] was cited for failing to maintain…supporting documentation." [Dkt. # 47, Ex. 10, p.2]. Thus, Plaintiff asserts that it is apparent that Defendant knowingly utilized unsubstantiated and false statistical data in the Performance Worksheet provided to her to induce her to hire the Defendant as her financial advisor and grant it discretionary authority to manage her accounts.**

**Defendant argues that Plaintiff's fraud claim must fail as a matter of law, asserting that, "Plaintiff has never advanced evidentiary support for the mere allegation of fraud and has never presented the specific acts upon which the claim is founded," thus contending that "because the Plaintiff is unable to identify <u>any</u> misrepresentation, her fraudulent misrepresentation count raises no genuine issue of material fact." [Dkt. # 41-1, p. 35-36]. In so arguing, the Defendant entirely fails to acknowledge the substance of the Plaintiff's fraud allegation.**

**Contrary to the Defendant's assertion, the Plaintiff's evidence, including expert opinion as to the inaccuracy of the figures in the Perforamnce Worksheet, and the SEC communications demonstrating the Defendant's prior awareness of**

**the false and misleading nature of the figures, presents evidence that is probative, and not "merely 'colorable,'" of fraud. *See Gibbons v. NER Holdings, Inc.*, 983 F. Supp. 310, 316-17 (D. Conn. 1997) ("If the plaintiff's evidence is merely 'colorable' or 'not significantly probative,' the court should grant summary judgment."). Therefore, where the Plaintiff has presented expert testimony, a book authored by the Defendant, and communications between the Defendant and the SEC to assert that the Defendant fraudulently presented her with misinformation, and where the Defendant summarily denies that a misrepresentation was made, the Court finds that the Plaintiff has presented sufficient evidence such that a reasonable jury could find that the Defendant committed fraud. Therefore, Defendant's motion for summary judgment as to Plaintiff's fraudulent misrepresentation claim (Count Five), is denied.**

**b. The SEC Investigation**

**The Plaintiff also claims that the Defendant engaged in fraud by nondisclosure, or "the intentional withholding of information for the purpose of inducing action." *See Pacelli Bros. Transp., Inc. v. Pacelli*, 189 Conn. 401, 407 (1983) (defining a fraudulent omission as "equivalent to a fraudulent misrepresentation"). The elements of fraudulent nondisclosure include a duty to disclose, followed by a failure to disclose known facts with "an intent or expectation by the declarant that the nondisclosure will 'cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction.'" *Sovereign Bank v. ACG II, LLC*, 08CV1600**

**WWE, 2010 WL 363336, *4 (D. Conn. Jan. 25, 2010) (quoting *Wedig v. Brinster,* 1 Conn. App. 123, 131, 469 A.2d 783 (1983)).**

**Under Connecticut law, a fiduciary has a duty to make a full disclosure "of all relevant facts which the fiduciary knows or should know." *See Pacelli Bros.,* 189 Conn. at 407-8. As this Court has previously recognized, a duty to speak, "i.e. to reveal information on which the plaintiff reasonably would be expected to rely," arises "where the parties have 'a relationship of trust and confidence' creating a 'duty to make a full disclosure.'" *Metro. Enter. Corp. v. United Technologies Int'l Corp.,* CIV. 3:03CV1685 JBA, 2006 WL 522384, *4 (D. Conn. Feb. 27, 2006)(quoting *Egan v. Hudson Nut Prods.*, 142 Conn. 344, 348, 114 A.2d 213 (1995)). This Court has recognized that "liability for nondisclosure may arise where a defendant knows information 'necessary to prevent his partial or ambiguous statement of the facts from being misleading.'" *Id.* (quoting Restatement (Second) of Torts §551 (2)).**

**Here, the Plaintiff's claim rests on the grounds that the Defendant engaged in fraudulent nondisclosure by failing to inform her that the SEC had audited the Defendant and found its Worksheet figures to be unsubstantiated and misleading. In particular, Plaintiff argues that, "the Defendant's intentional withholding and concealment from the plaintiff of the circumstances of the SEC investigation of the past-performance data requested by and supplied to the Plaintiff," and, "the Defendant's intentional concealment of the results of the SEC investigation from [Plaintiff], in the context of a fiduciary relationship, qualifies as fraud." [Dkt. # 47-1, p. 5; Dkt. # 47, p. 16].**

**Defendant does not dispute that it owed a fiduciary duty to the Plaintiff. [Def.'s Answer to Pl.'s Amended Complaint, Dkt. #11, ¶ 12]. Yet the Defendant fails to offer effective opposition to the Plaintiff's claim of fraudulent nondisclosure. Rather, Defendant simply argues that it cannot be held liable for failing to "furnish the Plaintiff with confidential information, about a periodic audit, that the Plaintiff never requested." [Dkt. # 51-1, at p. 9].**

**Therefore, where the Plaintiff has offered sufficient evidence such that a reasonable jury could find that the Defendant committed fraudulent misrepresentation and fraudulent nondisclosure, the Defendant's motion for summary judgment as to Plaintiff's fraud claim (Coutn Five) is denied.**

**F. CUSA Claim**

**Finally, the Plaintiff claims that the negligent and/or fraudulent misrepresentations and material omissions detailed above constitute violations of the Connecticut Uniform Securities Act ("CUSA"). [Dkt. #9, p. 8, 9]. CUSA provides in relevant part:**

> **No person who directly or indirectly receives compensation or other remuneration for advising another person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, shall: (1) Employ any device, scheme or artifice to defraud the other person; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon such other person. Conn. Gen. Stat. Ann. § 36b-5.**

**Where a plaintiff alleges that a financial advisor made an untrue statement of material fact or omitted to state a material fact regarding investment advice,**

**liability under the Act "may be premised on either intentional or negligent misrepresentations or omissions."** ***Lehn v. Dailey*****, 77 Conn. App. 621, 630 (2003). Thus, this court has held that an action brought under CUSA may survive insofar as a plaintiff has adequately alleged claims under either negligent misrepresentation or fraud.** ***See Spotts v. Humphrey*****, CIV 310CV00058 (PCD), 2010 WL 2388454 (D. Conn. June 9, 2010) (sustaining an action under CUSA where the plaintiff's pleading met the standard to allege negligent misrepresentation).**

**Plaintiff contends that the Defendant's "material misrepresentations to the Plaintiff…and its communications to the Plaintiff related thereto, made in connection with its advising the Plaintiff as to the purchase and sale of securities," constituted acts and/or omissions in violation of CUSA. [Dkt. #9, p. 9]. Relying on the same evidence set forth in her negligence and fraud claims, the Plaintiff again alleges that the Defendant made material misrepresentations in (1) negligently supplying the Plaintiff with a false probability of success rate for its 50% equity allocation scenario, (2) fraudulently or negligently providing the Plaintiff with misleading performance history numbers in its Investment Performance Worksheet; and (3) fraudulently failing to inform her that the SEC had found the Worksheet figures misleading. [Dkt. # 47, p. 17]. The Defendant disputes the Plaintiff's CUSA claim by maintaining that the Plaintiff has not "proven that [Defendant] made untrue or fraudulent representations." [Dkt. # 41-1, p. 38-9].**

**As discussed above, the Court finds that the Plaintiff has produced sufficient evidence such that a reasonable jury could find in favor of the Plaintiff as to her fraudulent misrepresentation and negligent misrepresentation claims. Accordingly, where Plaintiff's CUSA claim is predicated on such claims, Plaintiff has presented sufficient factual evidence such that a reasonable jury could find in favor of her CUSA claim as well. Thus, Defendant's motion for summary judgment as to Plaintiff's CUSA claim (Count Six) is denied.**

## IV. Conclusion

**For the foregoing reasons, the Defendant's motion for summary judgment is granted as to Count Two, Plaintiff's breach of contract claim, but is denied as to Counts One, Three, Four, Five and Six, which counts will proceed to trial.**

**IT IS SO ORDERED.**
**/s/**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: August 17, 2012**